[J-3A-2020 and J-3B-2020] [MO:Todd, J.]

# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

| | | |
|---|---|---|
| KONRAD KURACH, | : | No. 12 EAP 2019 |
| | : | |
| Appellant | : | Appeal from the Order of Superior |
| | : | Court entered on August 24, 2018 at |
| | : | No. 1726 EDA 2017 (reargument |
| v. | : | denied October 10, 2018) reversing |
| | : | the Order entered on April 21, 2017 |
| | : | and remanding to the Court of |
| TRUCK INSURANCE EXCHANGE, | : | Common Pleas, Philadelphia |
| | : | County, Civil Division at No. 00339 |
| Appellee | : | July Term, 2015. |
| | : | |
| | : | ARGUED:  March 10, 2020 |
| | | |
| MARK WINTERSTEEN, INDIVIDUALLY | : | No. 13 EAP 2019 |
| AND ON BEHALF OF ALL OTHERS | : | |
| SIMILARLY SITUATED, | : | Appeal from the Order of Superior |
| | : | Court entered on August 24, 2018 at |
| Appellant | : | No. 1730 EDA 2017 (reargument |
| | : | denied October 10, 2018) reversing |
| | : | the Order entered on April 21, 2017 |
| v. | : | and remanding to the Court of |
| | : | Common Pleas, Philadelphia |
| | : | County, Civil Division at No. 03543 |
| TRUCK INSURANCE EXCHANGE, | : | July Term, 2015. |
| | : | |
| Appellee | : | ARGUED:  March 10, 2020 |


## CONCURRING AND DISSENTING OPINION


**JUSTICE WECHT**                                     **DECIDED:  August 18, 2020**

I agree that Pennsylvania law does not require that general contractor overhead and profit ("GCOP") be included as a component of the actual cash value ("ACV") payment in the first step of a two-step process used to reimburse homeowners under insurance contracts.  *See* Maj. Op. at 18-20.  I agree as well with the Majority's decision

to rebuff the claim that "public policy" requires insurance contracts to include GCOP as part of an ACV payment. *See id.* at 20 n.13. Courts should not embark upon quixotic, exploratory voyages into the realm of "public policy" when called upon to determine the legality of insurance contracts. "Public policy" is not some "brooding omnipresence in the sky"[1] to be divined and proclaimed periodically by the judiciary. Instead, public policy is created and manifest, however imperfectly, in duly enacted statutes or regulations. These enactments are the products of our political branches, and the officials who populate those branches are regularly accountable to the electorate for the policy choices they make.

Although I agree with the Majority that the insurance contract before us is unambiguous in the particulars that the Majority examines, *see* Maj. Op. at 16-18, the contract is ambiguous for a different reason: the policyholders could not have known what "the law of [Pennsylvania] requires" with regard to GCOP, as set forth in the policy.[2] An ambiguous "policy provision is to be construed in favor of the insured and against the insurer." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999) (citation and internal quotation marks omitted). Accordingly, the decision of the Superior Court should be reversed.

I take up these "public policy" and "what the law of Pennsylvania requires" points in turn.

I

Konrad Kurach and Mark Wintersteen ("Policyholders") argue that "[e]nforcement of the terms of this policy . . . directly contravenes the law and public policy of the

---

[1]   *S. Pac. Co. v. Jensen*, 244 U.S. 205, 222 (1917) (Holmes, J., dissenting).

[2]   *See* Farmers Next Generation Homeowners Policy ("Policy") (Exhibit A to Wintersteen Amended Class Action Complaint, 10/2/2015), at 35.

Commonwealth," and that, "[i]n the event Truck Insurance is permitted to prevail in this quest for ill-gotten gains, it is likely that other insurance companies in Pennsylvania will follow suit and that the spread of this contagion will infect the entire industry with catastrophic damage to the insurance purchasing public." Policyholders' Brief at 45-46. Policyholders assert that "[i]ncluding GCOP in [step two] prejudices the insured and creates a disincentive to repair the premises." *Id.* at 6; *see also id.* at 26 ("Truck, by reducing the ACV payment by deducting GCOP in addition to depreciation, makes it more difficult, if not impossible, for the insured to make the necessary repairs."); *id.* at 38 n.14 ("By deducting GCOP from ACV, the insured may not have sufficient funds to undertake the repairs.").

Amici for Policyholders agree. *See* Brief of *Amicus Curiae*, Pennsylvania Association for Justice, at 8 ("Public policy . . . favors a system which encourages repair of properties rather than a process which creates disincentives for the insured to repair."); *id.* at 10 ("The Truck Insurance Company is attempting to establish a different payment system which discourages repairs, thereby decreasing policy payments and, unnecessarily, increasing insurer profits."); *id.* at 24-25 ("The scheme is devious, depriving the unsophisticated consumer of benefits for which a premium has been paid."); *id.* at 25 n.6 ("Thus the insured may just accept ACV and forego repairs to the ultimate benefit of the insurer. Profits always prevail."); *id.* at 30 ("Enforcement of the terms of this policy . . . directly contravenes the law and public policy of the Commonwealth."); Brief of *Amicus Curiae*, United Policyholders, at 6 ("[T]his Court can and should recognize such a public policy . . . . The holdback of GCOP results in policyholders not receiving the full ACV and, due to a lack of resources, it can result in policyholders never being able to access the replacement cost benefits for which they have paid an additional premium.").

I do not blame Policyholders and their *amici* for making these arguments, for "diligence is the mother of good fortune."[3]  In this instance, diligence requires making a public policy argument, as this Court has for far too long animated and blessed this extra-textual enterprise as a means to invalidate provisions of insurance policies.  *See, e.g.*, *Heller v. Pa. League of Cities & Municipalities*, 32 A.3d 1213 (Pa. 2011); *Eichelman v. Nationwide Ins. Co.*, 711 A.2d 1006 (Pa. 1998); *Hall v. Amica Mut. Ins. Co.*, 648 A.2d 755 (Pa. 1994); *Mamlin v. Genoe*, 17 A.2d 407 (Pa. 1941).

The Majority ultimately concludes that, "contrary to Policyholders' assertions," the Superior Court's decisions in *Gilderman v. State Farm Insurance Company*, 649 A.2d 941 (Pa. Super. 1994), and *Mee v. Safeco Insurance Company of America*, 908 A.2d 344 (Pa. Super. 2006), "do not establish a public policy precluding the GCOP provisions as found in Policyholders' policies."  Maj. Op. at 20 n.13.  In making this ruling, the Majority informs Policyholders that "a challenger who asserts that clear and unambiguous contract provisions . . . are void as against public policy carries a *heavy burden of proof*."  *Id.* (quoting *Sayles v. Allstate Ins. Co.*, 219 A.3d 1110, 1122-23 (Pa. 2019)) (emphasis added); *see also id.* (noting that Policyholders must show that the provision "conflict[s] with a long governmental practice, a statutory enactment, or obvious ethical or moral standards") (citing *Safe Auto Ins. Co. v. Oriental-Guillermo*, 214 A.3d 1257, 1262 (Pa. 2019)).

In several cases involving insurance contract disputes, I have objected to "this Court's freewheeling and unwarranted invocation of 'public policy.'"  *Sayles*, 219 A.3d at 1128 (Wecht, J., dissenting); *see also Oriental-Guillermo*, 214 A.3d at 1269-71 (Wecht, J., concurring); *Gallagher v. GEICO Indem. Co.*, 201 A.3d 131, 142 n.5 (Pa. 2019)

---

[3]    MIGUEL DE CERVANTES SAAVEDRA, DON QUIXOTE 754 (Charles Jeras trans., Harper & Bros. ed. 1923) (1605, 1615)

(Wecht, J., dissenting). Public policy is to be set by the political branches of our government—the Governor and the General Assembly—and not by this Court. Today's litigants, like other citizens, are free always to lobby those branches for any changes desired.

In the meantime, what evidence must a litigant challenging a provision of an insurance contract on public policy grounds submit in order to carry the day under the Majority's "*heavy burden of proof*" standard? What tips the scales to allow this Court to strike down an unambiguous provision of an insurance contract because it violates the amorphous "public policy" of our Commonwealth? What constitutes "a long governmental practice," and what suffices to offend "obvious ethical or moral standards?" *Whose* standards? Those of four or more Justices? I really could not tell you. Indeed, these lofty incantations raise more questions than they answer. And, worse, they encourage further litigation over the Court's "policy" inclinations. Are multiple decisions from our intermediate appellate courts enough to meet the "heavy burden of proof" necessary to provoke our oracular pronouncement of "public policy?" *See Gilderman*, 649 A.2d 941; *Mee*, 908 A.2d 344. How about non-binding guidance issued by the Department of Insurance? *See* Policyholders' Brief at 31-33 (citing the Pennsylvania Insurance Department's Homeowners Insurance Guide). Or perhaps documents issued by other states' departments of insurance? *See* Brief of *Amicus Curiae* United Policyholders at 16-19 (citing and discussing such documents). Maybe industry custom? *See id.* at 20-23 (highlighting insurance industry treatises).

This Court has stated that "public policy is more than a vague goal" and should "be ascertained by reference to the laws and legal precedents and not from the general considerations of supposed public interest." *Oriental-Guillermo*, 214 A.3d at 1261-62 (citation and internal quotation marks omitted). Yet this Court, at times, has taken it upon

itself to strike down a provision of an insurance contract based upon a judicially-pronounced "public policy," one that somehow the General Assembly—one of the two branches of our government that makes that policy—did not perceive to be important enough to include in the text of a duly-enacted statute. *See, e.g.*, *Sayles*, 219 A.3d at 1122-27.

"As members of the judicial branch, we do not, and indeed cannot, take positions on such matters of policy, because, aside from the domain of common law, setting public policy is properly done in the General Assembly and not in this Court." *Wolf v. Scarnati*, __ A.3d __, 2020 WL 3567269, at *18 (Pa. 2020) (citation and internal quotation marks omitted). While I recognize that a contract dispute, including a "public policy" claim, is rooted in common law, *see Oriental-Guillermo*, 214 A.3d at 1269-70 (Wecht, J., concurring), this Court should state explicitly that it is the pronouncements of the political branches of our government (meaning either the General Assembly or the Governor acting under powers delegated by the Legislature), from which we ascertain public policy. We should not continue down a murky and inchoate path, in which we occasionally and unpredictably substitute our own "public policy" views for those of our government's political leaders. *See Wilson v. Sch. Dist. of Phila.*, 195 A. 90, 93 (Pa. 1937) ("It is a well-settled maxim that under our theory of the separation of powers of government, legislative, judicial, and executive, the powers of each branch must be preserved to it.").

It may well be the case that shifting GCOP to a post-repair payment "prejudices the insured and creates a disincentive to repair the premises." Policyholders' Brief at 6. It may well be that the law is insufficiently protective of insureds. Policyholders should direct such arguments to their elected lawmakers in the General Assembly or to the duly appointed Insurance Commissioner; these are the officials who actually set public policy. This Court, and this case, is not the appropriate venue, or vehicle, to decide policy issues.

This Court should remove itself from "public policymaking," and rid itself once and for all of this vague and "quasi-legislative or even legislature-supervising" habit. *Sayles*, 219 A.3d at 1131 (Wecht, J., dissenting).

## II

I join the Majority's analysis that, reading the definition of ACV and Section 5(e) of the Policy "together," with "each given effect," Maj. Op. at 17-18, the Policy unambiguously states, as a general matter, that Truck does not intend that GCOP be part of an ACV payment, but, rather, that GCOP will not be paid "unless and until [the insured] actually incur[s] and pay[s] such fees and charges." Policy at 35.[4] But Truck's Policy is ambiguous for an entirely different reason. The Policy provides that Truck will shift GCOP payments to the second step "unless the law of your state requires that such fees and charges be paid with the actual cash value settlement." *Id.* (emphasis omitted). While I agree with the Majority that Pennsylvania law does not "require[] that such fees and charges" be a part of an ACV payment, *id.*; *see* Maj. Op. at 18-20, the fact that the Court has been called upon to decide this issue in this case means that the Policy was ambiguous for Policyholders.

As the Majority points out, "[p]olicy terms are ambiguous 'if they are subject to more than one reasonable interpretation when applied to a particular set of facts.'" *Id.* at 17 (quoting *Madison*, 735 A.2d at 106); *see also Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986) ("A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.").

In *Gilderman* and *Mee*, the Superior Court held that the particular insurance contracts at issue allowed insureds to collect GCOP as a part of ACV. *See Mee*, 908

---

[4]    I also agree with the Majority that Policyholders did not waive the question of whether the Policy is ambiguous as it pertains to whether Truck shifted GCOP to step two. *See* Maj. Op. at 17 n.11.

A.2d at 345, 350; *Gilderman*, 649 A.2d at 944-45. Today, we recognize that the *Gilderman* and *Mee* Courts made gap-filling holdings; if an insurance contract is silent as to whether GCOP should be paid in step one or step two, that silence will be interpreted to provide for a GCOP payment in step one. *See* Maj. Op. at 19.

But the *Gilderman* and *Mee* decisions themselves are "reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison*, 519 A.2d at 390. In *Gilderman*, the Superior Court, while noting that ACV was "not defined in the policy," nonetheless held that the first step of payment "will include use of a general contractor and his twenty percent overhead and profit." *Gilderman*, 649 A.2d at 943, 945. Likewise, in *Mee*, the Superior Court stated, *inter alia*, that: "(1) actual cash value includes repair and replacement costs; [and] (2) repair and replacement costs include [GCOP] where use of a general contractor would be reasonably likely." *Mee*, 908 A.2d at 350. The *Gilderman* and *Mee* Courts never explicitly limited their holdings to contracts where ACV was undefined, or contracts that did not mention GCOP. Reading *Gilderman* and *Mee*, and attempting to apply those decisions to a provision buried on the thirty-fifth page of a fifty-three page insurance contract, it is reasonable that individuals might disagree about what "the law of [Pennsylvania] requires." Indeed, they do so here.

In this case, the trial court and the Superior Court reached different conclusions as to whether *Gilderman* and *Mee* required that GCOP be a part of an ACV payment. *Compare* Trial Ct. Op., 4/20/2017, at 15 ("Pennsylvania insurance law indeed requires these fees and charges including GCOP to be paid as part of Step 1 actual cash value."), *with Kurach v. Truck Ins. Exch.*, 1726 & 1730 EDA 2017, 2018 WL 4041707, at *3 (Pa. Super. Aug. 24, 2018) ("However, *Gilderman* does not set forth binding Pennsylvania law defining how actual cash value is calculated. It defined the term in the absence of any definition in the policy itself, and thus analyzed the intent of the parties."). The well-

represented and well-advised parties in this case also interpret *Gilderman* and *Mee* in contrasting ways.  *Compare* Policyholders' Brief at 23-29*, with* Truck's Brief at 38-41.

Pennsylvania law stands in need of clarification, clarification that this Court provides today.  With this decision, the Court now resolves the dispute over how to interpret *Gilderman* and *Mee*, deciding the case in Truck's favor.  *See* Maj. Op. at 18-20.  The reasonable disagreement among the lower courts and the parties that brought us here is evidence that Policyholders could not have known what "the law of [Pennsylvania] require[d]" with regard to GCOP at the time Policyholders signed the contract.  Policy at 35.  In this instance, defining the law of Pennsylvania required this Court to grant *allocatur*, to weigh briefing and argument, and to adjudicate the present case at length.  Policyholders, and other individuals who will sign insurance contracts with similar provisions, now know what "the law of [Pennsylvania] requires."  *Id.*  But that law was unclear at the time Policyholders signed their contracts.[5]  Because Policyholders could not have known what Pennsylvania law required, it was unclear whether Section 5(e) of the Policy, shifting GCOP to step two, was applicable in Pennsylvania.  The contract was then susceptible of "more than one reasonable interpretation."  *Madison*, 735 A.2d at 106.  It was possible that Pennsylvania law required that GCOP be paid in an ACV payment, but it was also possible that Pennsylvania law required no such result, allowing Section 5(e) to have effect.  The possibility of these two interpretations rendered Section 5(e) ambiguous.

The Majority observes uncontroversially that "we are [not] required to defer to the conclusions of the lower courts, or the claims of the parties," in determining whether a policy provision is ambiguous.  Maj. Op. at 17 n.11.  Nowhere do I suggest otherwise.

---

[5]     It may be that, this Court having decided this case, this same provision would no longer be ambiguous if signed by the parties today.  But since Policyholders posit that their specific contracts are ambiguous, we must adjudicate that claim.

But the Majority misses the point. The applicability of Section 5(e) of the contract turns upon whether "the law of [Pennsylvania] *requires*" that GCOP be included in the ACV payment. Policy at 35 (emphasis added). The operative word is "requires." The law of Pennsylvania, per *Gilderman* and *Mee*, was ambiguous. Up until the moment this case was decided, our law did not state definitively whether an insurer must include GCOP in an ACV payment. Indeed, it is that very ambiguity that brought us this case. That the lower courts and the parties disagree about the meaning of the *Gilderman* and *Mee* holdings does not mandate this Court to defer to any particular interpretation, but it is evidence that Policyholders did not (and indeed could not) know what the law of Pennsylvania *required* at the time they signed their contracts. Applicability of the pertinent provision of the Policy turned upon whether our Commonwealth's law required a particular result. Until today, our law did not require a particular result. That ambiguity in our law led to the ambiguity in the Policy.[6]

"[T]he contract of insurance is to be read, in the event of any ambiguity in its language, in the light most strongly supporting the insured." *Weissman v. Prashker*, 175 A.2d 63, 67 (Pa. 1961). Because the Policy is ambiguous, we must read the language to support Policyholders' contention that GCOP should be paid in step one, as a part of

---

[6]     It may seem odd that a legal ambiguity can lead to an ambiguity in a contractual provision. However, I note that, Truck itself, as the drafter of the Policy, made the decision to have Section 5(e) turn on the development of state law. Truck could have investigated whether the law of Pennsylvania definitively stated whether ACV must include GCOP. Had it concluded that the law of Pennsylvania was uncertain, Truck could have shifted GCOP to step two without the conditional phrase "unless the law of your state requires that such fees and charges be paid with the actual cash value settlement." Policy at 35. Truck then could have attempted to enforce that unambiguous provision, an attempt that, based upon today's decision, would have been successful. Truck did not write such a provision. Thus, it was Truck itself that chose to manufacture the ambiguity that has brought us here today.

ACV, in accordance with the Superior Court's gap-filling holdings in *Gilderman* and *Mee*.

In line with this interpretation, I would reverse the decision of the Superior Court.